LILLIE BALLENGER, *et vir.*, v. DAVID L. MARK, *et ux.*

155 So. 106.

Opinion Filed May 26, 1934.

*Marks, Marks, Holt, Gray & Yates,* for Plaintiffs in Error;

No appearance for Defendants in Error.

PER CURIAM.—In this case a majority of the Court have reached the conclusion that in consonance with the salutary principles of common right and justice stated by the Supreme Court of the United States in Funk v. United States, 290 U. S. 371, 54 Sup. Ct. Rep. 212, 78 L. Ed. 231 (opinion filed December 11, 1933), changed conditions of a modern era brought about by the voluntary activities of married women in assuming the status of recognizable factors in the

business and industrial world, require the Courts of this State to take judicial notice of the fact that the ancient legal fiction of identity of husband and wife, heretofore supporting the doctrine of married women's liability first announced by this Court in Graham v. Tucker, 56 Fla. 307, 47 Sou. Rep. 563, to the effect that a married woman is not to be held liable for her torts, no longer exists in a practical sense, and therefore, consistent with our system of American constitutional law which recognizes and enforces the doctrine of equal protection of the laws for all with special privileges to none, the case of Graham v. Tucker, *supra,* should no longer be held to control the decision of an action on the case wherein plaintiff seeks recovery of damages for a tort alleged to have been committed by a married woman in connection with the use or employment of her separate property in a business, trade or occupation under circumstances wherein she would be held liable for her said tort but for her coverture.

The rule stated in the case of Graham v. Tucker, *supra,* is accordingly modified and restricted for future application to those only wherein married women are sued for torts not arising out of the use of their separate property for business, commercial, industrial, profit or income-producing purposes.

It follows that the judgment rendered for defendant married woman on her demurrer to the plaintiff's amended declaration below should be reversed, and the case remanded for further proceedings not inconsistent with this opinion, and it is so ordered.

Reversed and remanded.

DAVIS, C. J., and WHITFIELD and TERRELL, J. J., concur.

ELLIS and BUFORD, J. J., dissent.

BROWN, J., not participating.

WHITFIELD, J.—In this case the husband is made a party defendant with his wife, but the action is predicated upon a charge of negligence of the wife resulting in an injury to the plaintiff. It is in substance alleged that the defendant wife owned and operated an apartment or rooming house, and in connection therewith, and as a part thereof, maintained under her exclusive control a stairway for the use of those using the apartment or rooming house; and that she negligently permitted the stairway to become defective with a resulting injury to the plaintiff.

No ground of the demurrer to the declaration asserts an entire absence of liability of the defendant married woman as matter of law because of her coverture.

Assuming that under the ancient law of England, the married woman, because of her common-law disabilities, is not liable in damages to the plaintiff for the negligence alleged, the question argued is whether that common-law rule of non-liability of the married woman is now applicable in this State in view of existing organic and statutory provisions enacted since the adoption in 1829 as a part of the law of this jurisdiction, the common law of England which is "not inconsistent with" constitutional and statutory law. Act of Nov. 6, 1829, Sec. 87 (71) C. G. L.

During the ancient period when the common law of England was being developed, the husband and not the wife had control over her property and its uses; and injuries caused by the negligent use of her property were redressed in actions against him for damages, she being not liable because she had no part in the management, control or operation of her property, the rule of law being that those who operate property are liable for injuries caused by negligent operation.

The rules and principles of the common law are not in force in this State except in so far as they are *not inconsistent* with organic or statutory provisions.

Since the adoption of the common law in this jurisdiction, fundamental changes in living and business conditions have promoted the enactment of numerous organic and statutory provisions that are inconsistent with the rules and principles of the common law regulating the rights, duties and liabilities of married women with reference to the ownership, management and control of their separate property and to their earnings from employments by them separate from their husbands; and where such enactments are inconsistent with rules or principles of the common law, which prior thereto governed the same subjects, the enactments control and the common law is thereby abrogated or modified to the extent of the inconsistency. See S. F. & W. R. v. Geiger, 21 Fla. 669, 58 Am. St. Rep. 697; Abraham v. Baldwin, 52 Fla. 151, 42 So. 591, 10 Ann. Cas. 1148, 10 L. R. A. (N. S.) 1051; Broward v. Broward, 96 Fla. 131, 117 So. 691, H. N. 9; Banfield, *et ux.*, v. Addington, *et ux.*, 104 Fla. 661, 140 So. 893; Mayhew v. Burns, 103 Ind. 328, 2 N. E. 793; Flish v. Lindsay, 115 Mo. 1, 21 S. W. 907, 37 Am. St. Rep. 374; Hanriot v. Sherwood, 82 Va. 1.

In Quiltz v. Batter, 135 N. Y. 201, 32 N. E. 47, 17 L. R. A. 521, and other similar cases, the statutes may be more comprehensive in changing the common law, but the effect upon the common law of inconsistent statutes is elucidated. Merrill v. City of St. Louis, 83 Mo. 244, 53 Am. Rep. 576.

It is not necessary for a statute to repeal a rule or principle of the common law. If a statute is inconsistent with the common law, the statute controls, and the common law is abrogated or modified to the extent of the inconsistency. Without becoming a free dealer in this State, a married

woman may engage in an employment separate from her husband, and the earnings therefrom are her separate property. The law may justly entail a duty and liability commensurate with rights conferred, in order that there be no discrimination in rights and liabilities between married women and other persons enjoying similar rights.

In this case the coverture does not affect the right of the wife under the statute to engage in the employment of operating an apartment or rooming house and of maintaining a stairway therein under her exclusive control; and her liability results from injuries proximately caused by her negligent maintenance and control of such stairway, which maintenance and control she has by virtue of statutes and not of the common law. Therefore, a rule of law imposing liability upon her accords with the effect of the written laws of the State upon the common-law rule on non-liability of a married woman for negligence of her husband or his agents in managing and controlling her property.

Davis, C. J., and Terrell, J., concur.

Ellis, J. (dissenting).—I adhere to my concurrence in the opinion written by Mr. Justice Buford in this case in which he concluded that the judgment should be affirmed.

The case is before this Court on a writ of error taken to a judgment for the defendants, David L. Mark and his wife, Clara Mark, on a demurrer to a declaration in which the plaintiff, Lillie Ballenger, and her husband, sought damages for personal injuries sustained by Lillie Ballenger in walking down a stairway leading from an apartment which she occupied in a dwelling house owned by Clara Mark, who placed Mrs. Ballenger in possession of the apartment. The declaration alleges that "a step" of the stairway tilted which caused Mrs. Ballenger to fall and injure herself. It is alleged that Mrs. Mark negligently allowed the "stairway

and said step to be weak, loose, defective and insecure and that she knew, or by the exercise of ordinary and reasonable care, could have known of the condition of said "steps."

The alleged cause of action thus appears to rest not upon an affirmative tortious act of Mrs. Mark, not in any sense a pure tort, but upon the failure of a duty which by reason of her contract with Mrs. Ballenger she owed to her to keep the staircase free from the defect which it is alleged caused the accident.

The case of Banfield v. Addington, 104 Fla. 661, 140 South. Rep. 893, is not authority for the position assumed by the plaintiff in error in this case, because in that case the Court held that the act of Mrs. Addington in administering the treatment for a "permanent wave" to Mrs. Banfield was a "positive act of negligence." The opinion stated that the "effect of our statute authorizing married women to engage in employments separate from their husbands is to confer upon them the right to assume the position of master and servant, with all the rights and liabilities which necessarily go with that relation; that it thereby makes a married woman liable for any act of a servant employed by her, for which act she would be liable if she had committed the act personally, and not through her servant." On that principle the decision held Mrs. Addington to be liable in damages for the negligent act of her servant in administering the treatment.

I am still of the opinion that the argument in that case is fallacious and can be supported by no authority except court-made law, if such is of any value in our system of jurisprudence. It is the function of the Court to declare what the law is, not what it should be. When the judicial power is sought to be extended into the realm of the law-making power upon the assumption that legislators do not

move fast enough to keep pace with so-called altered social conditions and complex relations now existing and rapidly changing, the effort sets up a doctrine of Pharisaical justice which disparages the efficiency of the legislative branch of the Government by proclaiming its own superior alertness and wisdom which would be more becomingly left to the judgment of the sovereign people in constitutional convention represented.

The case of Funk v. United States of America, decided by the Supreme Court of the United States, December 11, 1933, has no bearing whatsoever upon the case at bar. That case relates solely to the competency of a wife to testify as a witness in behalf of her husband. It has no relation whatsoever to the policy of a State as expressed by legislative enactment restricting the powers of a married woman as to contractual capacity. It is for the Legislature to lift that handicap, if it be one, not for the Court.

In the case at bar the duty, if any, which Mrs. Mark owed to Mrs. Ballenger grew out of a contractual relation and was in no degree an affirmative or pure tort, and no liability attaches to her on account of the accident except as it may result from judicial fiat unconstitutionally asserted.

So I think the judgment should be affirmed.

BUFORD, J. (dissenting).—In this case writ of error is to a judgment of the circuit court in favor of defendant.

The plaintiff sued the defendant, a married woman joined by her husband, for damages occasioned by a defective step on a stairway of an apartment and rooming house operated and conducted by the defendant.

The judgment should be affirmed on authority of the opinion and judgment in the case of Graham v. Tucker, 56 Fla. 307, 47 Sou. 563.

This case is to be distinguished from Banfield, *et ux.*, v.

Addington, *et ux.,* 104 Fla. 661, 140 Sou. 893, in that in the Banfield case the injury was alleged to be the result of a positive act perpetrated by the servant of the married woman. In this case the injury is alleged to have been caused not by the affirmative act but by the failure to perform an act which the declaration alleges it was the duty of defendant to perform. It is true the amended declaration says: "That she (the defendant) so carelessly and negligently operated said rooming or apartment house that she carelessly and negligently allowed and permitted said stairway and said step to be weak, loose, defective and insecure," etc. But this language is not sufficient to show a positive tortious conduct on the part of the defendant, a married woman, to warrant recovery. It at most alleges only the non-performance of a duty the performance of which rested upon the married woman defendant, and further, that this non-performance of duty resulted in the injury to the plaintiff. For such injuries recovery cannot be had against married women. The law in this regard is ably discussed in Graham v. Tucker, *supra,* and the same conclusion was reached there which we reaffirm here. For further discussion of this phase of the law applicable to this case see the dissenting opinion of Mr. Justice Ellis in the case of Banfield v. Addington, supra.

Judgment affirmed.

Ellis, J., concurs.

Davis, C. J. (concurring with Whitfield, J.).—The sole decision to be made in this case is whether or not, in a suit between two married women, one of whom has suffered an injury because of the negligence of the other, recovery of damages shall be denied to the injured woman because of the fact that the woman who owned the property that was so negligently maintained as to cause the other's injury, was

herself a married woman. To state it another way, is a married woman engaged in business entitled to claim exemption from liability for her torts, merely because of what was decided by this Court twenty-five years ago in the case of Graham v. Tucker, 56 Fla. 307, 47 Sou. Rep. 563, 19 L. R. A. (N. S.) 531?

The cause of action set up in the declaration in this case was, in substance, as follows: That the defendants, David Mark and Clara Mark were and are husband and wife; that at the time of the injury complained of, the wife, Clara Mark, was the owner of a flat or dwelling house which she operated and maintained as a public rooming or apartment establishment; that in said apartment or rooming establishment, a public stairway was maintained for the use of tenants and invited guests of the premises; that these steps were under the exclusive control of the owner of the premises (the married woman Clara Mark) whose duty it was, for the protection of others, to keep the steps in a reasonably safe and secure state of repair; that on October 20, 1931, the plaintiff, Lillie Ballenger (the other married woman in this case) while lawfully attempting to make use of the defendant's stairway, which was not at the time in a good and secure state of repair, was negligently injured by the unexpected tilting of a loose step constituting a part of the stairway; that the tilting of said step and the infliction of the injury complained of was occasioned by the negligent, careless and defective condition in which the stairway was being maintained and allowed to be publicly used, by the owner of the premises, who is alleged to have known of the dangerous and defective condition and failed to take steps to remedy the same; that in consequence of what happened, plaintiff sustained a severe injury which was occasioned by a fall on the defective stairway, for which

she sued the owner of the premises and claimed $5,000.00 damages.

For the purposes of this discussion, the writer of this opinion will concede that the quarter-century-old precedent of Graham v. Tucker, *supra,* stands as an ·apparent bar to recovery by the plaintiff in this case, unless that case can be distinguished from the present one, or overruled. Whether or not one or the other of these courses is pursued is immaterial. Hundreds of well considered cases, including some recent ones from our own jurisdiction, have rejected the ultra-conservative notion which earlier cases seemed to accept as an unvarying precedent, that the courts of this country, in the face of greatly changed conditions are still chained to ancient *formulae* laid down in prior decisions which may have been rightfully declared at the time but are no longer sound in principle as required to be applied in a new era. Tribunals of last resort are no longer considered to be utterly powerless to declare and enforce modifications deemed to have been wrought in the common law itself by force of changed conditions arising subsequent. The advanced judicial view is that the power (and duty) of judges of such courts is as great today as it was in the time of the venerable common law judges who did so much to develop our unwritten law along the lines of justice and practical common sense, weighed and considered in the light of increasing knowledge the development of intercourse between States and nations, and the changing complexion of juristic rights as modified by new relationships between individuals and their associations with each other in a revamped political, economic and social order of things.*

*For an illuminating and scholarly article on this subject see: Florida State Bar Association Law Journal, Vol. 7, No. 6, beginning at page 109, by Hon. Miles M. Lewis, of the Jacksonville Bar.

And indeed I find my most recent support for this view in a decision of the United States Supreme Court handed down as recently as December 11, 1933. In the case I refer to, that Court, speaking through its universally acknowledged most conservative member (Mr. Justice SUTHERLAND), departed from two of its previous decisions denying the right of a married woman to testify for her husband in the Federal Courts, and said:

"Both the petitioner and the Government, in presenting the case here, put their chief reliance on prior decisions of this Court. The Government relies on United States v. Reid, 12 How. 361; Logan v. United States, 144 U. S. 263; Hendrix v. United States, 219 U. S. 79, and Jim Fuey Moy v. United States, 254 U. S. 189. Petitioner contends that these cases, if not directly contrary to the decisions in Benson v. United States, 146 U. S. 325, and Rosen v. United States, 245 U. S. 467, are so in principle. * * *

"It may be said that the Court should continue to enforce the old rule, however contrary to modern experience and thought, and however opposed, in principle, to the general current of legislation and of judicial opinion, it may have become, leaving to Congress the responsibility of changing it. Of course, Congress has that power; but if Congress fail to act, as it has failed in respect to the matter now under review, and the Court be called upon to decide the question, is it not the duty of the Court, if it possesses the power, to decide it in the light of present-day standards of wisdom and justice rather than in some outworn and antiquated rule of the past? That this Court has the power to do so is necessarily implicit in the opinions delivered in deciding the Benson and Rosen cases. And that implication, we think, rests upon substantial ground. The rule of the common law which denies the competency of one

spouse to testify in behalf of the other in a criminal prosecution has not been modified by Congressional legislation; nor has Congress directed the Federal Courts to follow State law upon that subject, as it has in respect to some other subjects. That this Court, and the other Federal Courts, in this situation and by right of their own powers, may decline to enforce the ancient rule of the common law under conditions as they now exist we think is not fairly open to doubt. * * *"

And so it was that, with the foregoing declaration of a fundamentally sound judicial principle, the Supreme Court of the United States in the case of FUNK v. UNITED STATES, 290 U. S. 371, 54 Sup. Ct. Rep. 212, 78 L. Ed. 231 (opinion filed December 11, 1933, No. 394, October term), without in anywise destroying its earlier decisions as precedents controlling situations of the character prevailing at the time they were first decided, simply avoided directly overruling such previous decisions by holding that, because it was the characteristic principle of the common law not to assume that the sources of its supply ever became exhausted, the United States Supreme Court, in applying the common law to new circumstances, would mold and shape the common law into new and not less useful forms, when by every reasonable test, its ancient precedents, *in their specific application* to new conditions, have been found by the Court to be neither wise nor just.

The United States Supreme Court in that case went further and declared that to concede the capacity for growth and change in the common law that had enabled it to draw its inspiration from every fountain of justice, and at the same time to hold that the courts are forever bound to perpetuate ancient rules affecting individual responsibilities to the remainder of society, when it is found that such

ancient rules should be amended or repealed insofar as their application to modern conditions of life and human relationships are concerned, is to deny to the common law that flexibility and capacity for growth and adaption which was the peculiar boast and excellence of the common-law system in the place of its origin. That no harm can be done to our legal system by action of the courts in revising their own decisions must be conceded, because the Legislature is always left with power, despite the modernization of "judge-made" rules of law, to reestablish by statute, any of the ancient rules so revised, if the law-making power should decide that it wants them still to prevail although found by the courts to have become obsolete.

So the *ratio decidendi* of the opinion of the Federal Supreme Court in the Funk case was not that the Court in that case should assume the power to *legislate* to obviate a perceived evil necessitating legislation as a remedy. On the contrary the sole proposition determined was whether or not in the light of changed conditions, it should perpetuate *one of its own rules* after the admitted experience of bench and bar had both demonstrated to the Court that its pre-existing rule should not be longer adhered to and enforced as against new and changed conditions. Such change in conditions, if it could have been foreseen, the original court prescribing the rule would no doubt have taken into account and made an allowance for it, had such court been endowed with the gift of prevision at the time it decided the first case on the subject.

In the twenty-five years that have elapsed since the case of Graham v. Tucker, *supra,* was decided by this Court at the June term, 1908, the usages, customs and institutions of the people, not only of this State, but of the entire world, in respect to the duties, rights, privileges and responsibilities

of married women have been radically changed and placed on a more advanced conception of the modern position of the married woman as an industrial, economic, social, political and business factor.

So great has been this change that it was mentioned in the Treaty of Versailles by the nations of the world in their course of rearranging the difficulties growing out of the World War. And on more than one occasion since that time, international diplomatic conferences have been arranged for the purpose of further discussing it. In the light of present-day conditions of our laws, no longer does a married woman irrevocably lose her citizenship by marriage to an alien. Nor has the national government itself hesitated to appoint to some of its highest offices married women to act as its representatives at home and abroad. And even as this is written, a married woman as Secretary of Labor of the United States exercises the delicate powers of the most important cabinet post in the United States government insofar as its recovery legislation is concerned, while another married woman serves in our own State as one of the three members of Florida's Railroad Commission, —a *quasi* judicial body vested with broad powers requiring judgment for their proper exercise as important in many respects as that exercised by the members of this Court.

In 1914 the Supreme Court of the United States pointedly observed that "the identity of husband and wife" which was the foundation of many of the common law rules governing the rights and liability of married women, "is a fiction now vanishing." Williamson v. Osenton, 232 U. S. 619, 34 Sup. Ct. Rep. 442, 58 L. Ed. 758. And in the case just cited that high Court swept away so far as it was concerned, the last vestige of an obsolete common law doctrine that had refused to recognize any condition whereby the

Courts could perceive a separate domicile of the wife, though limited substantially to the extent of her individual interest in free self assertion, such as for recovery of damages for wrongs done her, and kindred actions.

The formal adoption of the common law after the Revolution, as the basis for our American common law, explicitly or in judicial practice, extended only so far as suited American conditions. The attitude of the American courts in the earlier cases was one of reception of the English common law as an ideal, but a reception of it only so far as it suited contemporary American conditions.

This was inevitable, because in the beginning there was no body of American law to be looked to as an independent authority. In fact the first volume of American reports was not published until 1789, and less than a dozen volumes of American decisions were printed in 1800. Thus, at the very outset, by this fortuitous circumstance, many of the English common-law conceptions of the status and rights of married women never received in the beginning any recognition in the United States at all.*

Kent, the American Blackstone, was appointed to the New York Bench in 1798, which was at a time when there

---

*Such, for example, as the common law rule concerning FREE BENCH. This was a property right obtainable by a widow in her husband's copyhold estate if, having been accused of inconstancy to her husband in her lifetime, she, after his death, would come into Court riding on a black ram, with his tail in her hand, repeating as she came, a meaningless and degrading jargon as follows: "Here I am, Riding on a black ram. Like a whore as I am, and for my crincum crancum, I have lost my bincum bancum, And for my tail's game, Have done this wordly shame; Therefore, Mr. Stewart, let me have my land again. Cowel." For an authentic account of this procedure as being a part of the English common law privileges of married women, see: Tomlin's Law Dictionary, Vol. 1, page 849.

were no reports published in that State. So, free from the hampering precedents of the early English common law, Kent, in his twenty-five years as judge and chancellor not only gave an original form to the entire unwritten law of his State based upon common-sense ideas of right and justice, but made an unrivalled contribution to the law of the entire United States as well. Kent's Commentaries are therefore, by universal consent, deemed worthy of a place in our judicial history equal to that of Blackstone in the history of the English law.

Among the notable innovations made in the common law during Kent's time, were the repudiation by the American courts of the English common-law doctrine of the merger of torts in crimes and of postponement of the civil action for tort until the crime could be redressed; permitting suit upon a contract by the beneficiary of it (now the general rule everywhere but not of the ancient common law) ; recognition of a married woman's separate domicile, for the purposes of divorce (later extended to other cases by the 1914 decision of the United States Supreme Court in Williamson v. Osenten, *supra*) ; upholding the right of regulation of private businesses when "affected with a public interest;" decisions laying the foundation for subsequent decisions forbidding the malicious use of a land owner's privileges; substitution of navigability for the tidal test of admiralty jurisdiction; introduction of the doctrine of color of title in the law of adverse possession; decisions reversing the common-law duties respecting trespasses of animals on unfenced lands, etc. I could enumerate others, but the foregoing is sufficient for purposes of illustration. Nearly every one of the changes originating in Kent's time have been incorporated into our own common law, some by decisions of this Court.

In the realm of non-contract law, we are dealing exclusively with the rights and liabilities of persons in their relationships, associations, dealings and contacts with others. In this realm of jurisprudence, our traditional judicial tenet that the common law is part of our colonial birthright brought over by our forefathers to these shores, has always historically been subject to the observations of many of our able judges to the effect that common law concepts of property, liberty and justice in order to be applicable in this country, must be such as are fitted to our own peculiar conditions as they are found to exist, or are evolved from time to time in the onward march of social, industrial and economic progress.

This Court as late as Banfield v. Addington, 104 Fla. 661,140 Sou. Rep. 893, has recognized the rule of liability for her torts of a married woman engaged in a profitable business, when the alleged tort was committed in the course of carrying on that business. This was done despite the contention that liability for such a tort had been denied in Graham v. Tucker, *supra,* twenty-five years before.

The doctrine of Banfield v. Addington, *supra,* which is our latest case on this subject, should be expanded rather than contracted. It should be extended to an unconditional declaration of liability for torts on the part of married women wherever committed by them in the course of their engaging in or carrying on a business, occupation or trade in their own right with their own property. Nor should the liability for such torts be limited to the so-called "pure tort" which is an act of commission and not of omission.

If the plaintiff in this case had declared for an injury sustained by her on an elevator operated by defendant's servant in a building owned by the defendant married woman, we should have been compelled to hold her liable

for such a tort on the principle decided in Banfield v. Addington, *supra*.

This being so, there is no just or logical distinction for saying that because the defendant married woman merely neglected her public stairway by leaving it in a dangerous condition while she was engaged in conducting an apartment or rooming house (which is a business of a public character) that no liability for the admittedly tortious injury should be held to have attached, simply because of what was said a quarter century ago in Graham v. Tucker, *supra*.

The ultimate protection of all private rights to life, liberty and property as secured to every individual in the American constitutional system, rests today upon a non-discriminatory judicial application of particular rules of law to all those similarly situated:

If three persons can own and operate apartment houses for profit side by side in competition with each other on the same street in the same city, one a single woman or widow, one a married woman and one a married man, there is absolutely no imperishable virtue of profound logic, skilful reasoning nor refined distinction kept judicially sacrosanct by continuing blind adherence to a rule of law which, if perpetuated in a case like this, will say to the unmarried single woman or widow on the left, and the married man with a family to support on the right, that the woman who operates the house in the middle, because she happens to be a married woman, shall be freed from the legal obligations and concomitant expense that the law unreservedly puts on the other two competing in the same business beside her. It should be the enforceable legal duty of all to keep their gainfully employed premises in such reasonable safe state of repair that the occupants and invited guests thereof will not be injured through negligent

omissions to keep secure steps and other parts of the buildings which observation and experience demand shall not be allowed to remain in a dangerous condition, at least without the posting by the owner of some warning of the danger to be anticipated.

To so declare as to married women in this case, is not judicial legislation. On the contrary, it is at most but the judicial amendment of a now obsolete twenty-five-year-old court decision (necessarily made by the Court itself), in order to bring its own unwritten or judge-made law up to date in order to meet the requirements of an advanced industrial, economic and business era,—a new era wherein married women owning property and employing it gainfully in competitive businesses with others under legal liability, should no longer be held exempt from the obligations the law imposes on all property owners to so use their property as not to injure the rights of others, whether engaged in competitive business or not.

In this very case, if the plaintiff, Mrs. Ballenger (herself a married woman), while walking down the same steps on which she had suffered the injury for which she sues the defendant (another married woman) as the reasonable owner, had negligently and carelessly struck a match to light a cigarette, and had carelessly thrown it down on such steps in such manner as to set those very steps on fire, she would have committed a tort of the so-called "pure" variety for which she would have admittedly been liable to the owner, under all of our decisions.

To say that one married woman who owned those steps can sue another married woman for negligently burning them, but that she herself cannot be held liable to respond in damages for negligently causing injury to another by means of the condition in which she maintained and used

them, for business purposes, is to my mind utterly irreconcilable with any sound principle of justice. For that reason, I think this Court is not only justified (but it is performing a duty) in approving by its example the recent precedent set by the United States Supreme Court in the *Funk* case, *supra,* when it proceeds to revise its own decisions on the law of responsibility of married women for torts, so as to make them conform to modern standards of fair conduct, at least insofar as may be concerned the proposition of liability for torts of married women engaged in gainful businesses in competition with others under liability. This is but conforming equality of privilege and opportunity to a commensurate standard of duty and liability which should control the new status of married women in business and industry.

Lest what I have heretofore said be taken as the statement of an ultra progressive view not at all in harmony with the conservatism that should control appellate courts when called on to meet and decide new applications of the existing principles of law, I quote as follows from an article appearing in the January, 1932, issue of the United States Law Review as prepared by United States Circuit Judge JOHN J. PARKER, whose conservatism in matters judicial is well recognized by bench and bar alike.

Says Judge PARKER in the article referred to:

"In every civilized country the judiciary occupies a position of great importance. The judge is everywhere more than a mere arbiter of disputes. It is his peculiar function to interpret the law to his people, to bring wisdom and the will of God to reign in the affairs of men; and the interpretation of the law means more than the application of statutes and precedents to disputes as they arise. It means the ability to grasp the true relationships evolved by the

changing conditions of society and to express the rules of right living which these relationships demand. Society is an organism. The law is its life principle. And the supreme function of the great lawyer or the great judge is to interpret that life principle for his generation and lay down the rules by which men and society may safely live. In America the function of the judge is even greater than this. He must be a statesman as well as a lawyer. He must interpret the law as he sees it developed *and at the same time apply to changing conditions the principles involved* in our written fundamental law, which is the basis of our national life."

The ancient common-law maxim: *"Ex facto jus oritur"* is ample justification for the courts to keep the common law a living and progressive legal science. Upon that principle I think the judgment in this case should be reversed.